**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **GERALD J. IWANEJKO, JR., GERALD J. IWANEJKO, SR., and PATRICIA IWANEJKO,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**COHEN & GRIGSBY, P.C., THE CITY OF PITTSBURGH, PA., PITTSBURGH POLICE OFFICERS JAMES L. AKER, DONALD SAVKO AND JOSEPH NICHOLAS,**<br><br>**Defendants.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)   **2:03-cv-1855**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## <u>MEMORANDUM OPINION AND ORDER OF COURT</u>

Before the Court for consideration and disposition is DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT, with brief in support (*Document Nos. 122 & 123*), filed on behalf of the City of Pittsburgh and Pittsburgh Police Officers James L. Aker, Donald Savko and Joseph Nicholas and the MOTION FOR SUMMARY JUDGMENT, with brief in support and reply brief (*Document Nos. 117, 118, 145),* filed on behalf of Cohen & Grigsby, P.C. ("C & G"). In response thereto, plaintiffs Gerald J. Iwanejko, Jr., ("Iwanejko") Gerald J. Iwanejko, Sr. ("Mr. Iwanejko") and Patricia Iwanejko ("Ms. Iwanejko," and collectively "the Iwanejkos") have filed PLAINTIFFS' OPPOSITION TO JOINT MOTION FOR SUMMARY JUDGMENT OF PITTSBURGH POLICE DEFENDANTS (*Document No. 144*) and PLAINTIFFS' OPPOSITION TO DEFENDANT COHEN & GRIGSBY, P.C. MOTION FOR SUMMARY JUDGMENT (*Document No. 143).*  The issues have been fully briefed by the parties, and the matter is ripe for disposition.

### <u>Background</u>

The procedural history of this case has been set forth in previous memorandum opinions and will not be recited herein. *See* Document Nos. 62, 63 & 80.  Except as otherwise noted, the

following facts are not disputed.[1]

On Monday, December 3, 2001, Iwanejko, an associate attorney at Cohen & Grigsby ("C & G"), arrived at the office before 8:00 a.m. to complete an assignment that was due early that day.  Motion at ¶¶ 12-13.  However, due in part to various stressors in his life, Iwanejko erroneously believed that it was Sunday, December 2, 2001 and that he had a whole day to complete the task.  *Id.* at ¶ 14; *see also* Iwanejko Deposition at 83-88.  When other employees started to arrive, Iwanejko realized that it was Monday morning and that he did not have a whole day to complete the task.  Motion at ¶ 14.  Apparently due to this realization, Iwanejko had an acute psychotic episode.  *Id.*  He began shouting and using profanities.  *Id.*; *see also* Iwanejko dep. at 130-31 ("I starting yelling, ranting, raving saying nonsensical things, swearing.");

Finding Iwanejko's conduct to be inappropriate, Fredrick L. Tolhurst ("Tolhurst"), another attorney at C & G, went to Iwanejko's office and requested that he stop yelling and swearing.  *Id.* at ¶ 15.  When Tolhurst confronted Iwanejko about his behavior, Iwanejko pushed Tolhurst out of the way and left his office for a few moments.  *Id.* at ¶ 16; *see also* Iwanejko Deposition, p. 135-37, 356.  Tolhurst and Iwanejko then returned to their respective offices.  Motion at ¶ 17.  After a short hiatus in Iwanejko's behavior, he began shouting again.  *Id.*  Tolhurst returned to Iwanejko's office in an attempt to quiet him.  *Id.*

At this point, Iwanejko was ranting and raving about his father.  Motion at ¶ 18.  Tolhurst's affidavit states that Iwanejko was holding a bottle of contact lens solution and speaking as if the solution had some sort of medicinal or healing powers.  *Id.*[2]  At this time, Tolhurst realized that Iwanejko was not thinking or speaking coherently.  *Id.*  Iwanejko, still holding the bottle of contact lens solution, then left his office and stated that he was going to

---

[1].  Plaintiffs do not admit the truth of numerous facts set forth in support of the Motion for Summary Judgment, but in many instances Plaintiffs do so only on the basis that they are without personal knowledge of the facts to which others have testified.  In many instances Plaintiffs have not "identif[ied] those facts of record which would contradict the facts identified by the movant."  *Childers v. Joseph*, 842 F.2d 689, 694-95 (3d Cir. 1988); *see also* Fed.R.Civ.P. 56(e).

[2].  Iwanejko has no recollection of this particular conduct.  Iwanejko's deposition at 152.

2

meet his father at the parking garage. *Id.* at ¶ 19.  Tolhurst requested that Iwanejko stay in his office, but he refused.  *Id.*  Out of concern for Iwanejko's safety, Tolhurst followed Iwanejko as he went to the elevators.  *Id.* at ¶ 20.  Tolhurst also asked a secretary to contact Tom Wettach ("Wettach"), Iwanejko's supervisor and mentor, as Tolhurst believed that Wettach might be able to reason with him.  *Id.*

Iwanejko proceeded down the elevators to the parking garage of the Westinghouse Building.  *Id.* at ¶ 21.  The Westinghouse Building garage has four floors; each has a descriptive identifying letter, specifically A through D, from top to bottom, respectively.  *Id.*  Iwanejko exited the elevators on the top floor of the garage, the "A" level.  *Id.*  Throughout this time, Iwanejko's behavior was erratic, varying from periods of screaming and yelling profanities to periods of calm behavior.  *Id.*

Upon arriving at the parking garage, Iwanejko's father was not present.  *Id.* at ¶ 22.  However, at this time, a car traveled up the inside ramp of the garage from the lower "B" level.  The driver of the car, later identified as Linda Kelley, parked and exited her car.  *Id.*

At this point in the story the facts become disputed.  According to Kelley, Iwanejko suddenly screamed something incoherent, threw the bottle of contact lens solution in her direction, and abruptly rushed over to and assaulted her.  *See id.* at ¶¶ 23-24.  Tolhurst's recollection of the incident is essentially the same, except that Tolhurst's affidavit reflects that that Iwanejko rushed toward Kelley, placed his arms around her and attempted to kiss her.  Tolhurst affidavit at ¶ 19.  According to both Tolhurst and Kelley, Tolhurst then rushed over and pulled Iwanejko off Kelley.  *See id.* at ¶ 25.  Iwanejko supposedly screamed incoherently while being held by Tolhurst.  *See id.*

Iwanejko, on the other hand, disputes both Tolhurst's and Kelley's version of what happened.  At his deposition Iwanejko testified that he did in fact encounter Kelley in the parking garage, but that he never assaulted, tried to kiss or otherwise accosted her.  Iwanejko also testified that he did not come within ten (10) feet of Kelley, although he conceded that he may have yelled or said something inappropriate to her.  Iwanejko's deposition at 152; *see also* Iwanejko deposition at 143 ("All I remember is that she was apparently startled at my

behavior.").

At some point, Tolhurst suggested that someone call security and that the police be alerted. Motion at ¶ 28. Iwanejko followed or was escorted by a parking garage employee down to the "B" level. *Id.* at ¶ 30; Iwanejko deposition at 144. Tolhurst followed Iwanejko. Motion at ¶ 30. During this time, Iwanejko continued to go in and out of screaming bouts. *Id.*

Tolhurst's affidavit reflects that upon reaching the "B" level, Iwanejko ran to the garage's entryway, laid down in the path of incoming vehicles, and was ranting and raving. *Id.* at ¶ 31. The affidavit also reflects that Tolhurst and another man pulled Iwanejko out of the path of traffic and let him lay on the concrete, where he continued to babble incoherently. *Id.* at ¶ 32. Iwanejko testified, however, that when he reached the "B" level he was surrounded by five (5) police officers. Iwanejko deposition at 144. Iwanejko strongly contends that he never laid down in the path of oncoming vehicles and yelled for drivers to run over him. Iwanejko deposition at 150-151.

Pittsburgh Police Officer James L. Aker ("Officer Aker") was dispatched to respond to the incident, which was then described as "women attacked in parking garage." Motion at ¶ 33. Officer Joseph Nicholas ("Officer Nicholas"), proceeding as backup, arrived first at the scene as he was patrolling nearby in downtown Pittsburgh. *Id.* at ¶ 34. Officer Nicholas supposedly observed Iwanejko laying on the concrete. *Id.* According to the Officers, Iwanejko was unresponsive to Officer Nicholas and merely laid on the ground with his eyes closed. *Id.* Around this time, Tolhurst informed Officer Nicholas about Iwanejko's alleged behavior, including the alleged assault of Kelley. *Id.* at ¶ 35.

The Officers contend that after a few minutes had passed, Officer Nicholas and Iwanejko's co-workers, who were then gathered at the scene, talked Iwanejko into getting up. *Id.* at 134. According to their version of the facts, another incident prompted Officer Nicholas to request the presence of additional officers, and Iwanejko ended up standing and facing a wall. *Id.* He supposedly became very agitated and was ranting, mumbling and crying. *Id.* at 134. Officer Nicolas, afraid that Iwanejko was a danger to himself and others, supposedly handcuffed Iwanejko at this time. *Id.* at 135. Iwanejko then began banging his head off the wall; Officer

4

Nicholas quickly pulled him away from the wall to prevent Iwanejko from injuring himself. *Id.* Iwanejko testified that his recollection of what happened at this point is not totally clear because "things were happening pretty quickly." Iwanejko deposiiton at 147. However, at his deposition he did not testify to banging his head off of the wall. *See id.* at 146-50.

When Officer Aker arrived on the scene, it appeared that Officer Nicholas had control of the situation. Motion at ¶ 37. Officer Nicholas told Officer Aker that the victim was upstairs and needed to be questioned. *Id.* Officer Aker left the garage to get a statement from Kelley. *Id.* Kelley told Officer Aker her version of the incident. *Id.* at ¶ 38. Kelley informed Officer Aker that she did not want to press charges against Iwanejko, rather she wanted him to get help at Western Psychiatric Institute and Clinic ("Western Psych") as she feared he was a danger to himself and others. *Id.*

The Officers contend that they determined that Iwanejko was a danger to himself and others and was in need of psychiatric evaluation. Iwanejko contends, generally speaking, that the Officers fabricated and/or lied about what happened, and that he should not have been involuntarily committed because he did not meet the legal criteria for same. Iwanejko's Deposition at 183. However, in Iwanejko's own words, he was "absolutely acting crazy, no question" and does not dispute he was severely mentally disabled that day. *See id*, p. 174, 175, 183 ("I was crazy.").

The Officers placed Iwanejko in the back seat of the police car. They contend that while Iwanejko was still sitting in the police vehicle, he became disturbed and began to thrash about. Motion at ¶ 40. According to the Officers, Iwanejko got out of his safety belt, spun around in his seat, attempted to kick the windows out of the car, pounded his head against the partition in the car and made incoherent biblical references. *Id.* Iwanejko, on the other hand, testified at his deposition that he merely moved around to see what was happening, and that he never attempted to kick the windows out of the police car. Iwanejko deposition at 155-56.

Officer Nicholas and Officer Donald Savko ("Officer Savko") transported Iwanejko to Western Psych. Motion at ¶ 41. After the police cruiser departed to take Iwanejko to Western Psych, Tolhurst spoke with Officer Aker and told the Officer all of the facts within his

knowledge up to that point in time. *Id*. at ¶ 42.

The Officers contend that "[o]n the way to Western Psychiatric, Iwanejko continued to pound his head against the windows of the car and made biblical references concerning 'washing Jesus' feet.'" *Id*. at ¶ 43.  Iwanejko contends that he was "shifting positions" while riding in the police car and "trying to look out the window," but was not trying to put his head through the window.  Iwanejko's Deposition at 169.

Upon arrival at Western Psych, Iwanejko acted aggressively, which he contends was due to drugs which were administered intravenously.  *See* Motion at ¶ 44; Iwanejko's Deposition, p. 174-77, 181.  Indeed, due to his conduct Iwanejko had to be strapped to a gurney and shackled to a stretcher by hospital employees.  Motion at ¶ 44.  Additionally, without provocation, Iwanejko attempted to grab a nurse in an inappropriate manner.  *See* Iwanejko's Deposition, p. 176-77.

Officer Aker filled out an Application for Involuntary Emergency Examination and Treatment based on what he witnessed and information he received from other witnesses. Motion at ¶ 47.  Officer Aker then left Iwanejko at Western Psych and had no further involvement in the matter.  *Id*. at ¶ 48.

Iwanejko was examined by two physicians at Western Psychiatric; both determined that he was severely mentally disabled and in need of treatment.  *Id*. at ¶ 45.  Additionally, upon reviewing the records provided by Western Psych, three additional physicians, Dr. Cameron Carter, Dr. Timothy Mitzel and Dr. Lawson Bernstein, each concluded that Iwanejko had an acute psychotic episode and was in need of medical care.  *Id*. at ¶ 46.  Furthermore, Dr. Bernstein described Iwanejko's episode as a florid psychotic episode, which means that a person is overtly and in a readily recognizable fashion agitated, delusional, and presenting in such a way that even a layperson could tell he was psychotic.  *Id.*

Iwanejko stayed at Western Psych for approximately a week.  He was offered FMLA leave while he recovered.  C & G hired a physician, Lawson Bernstein, M.D., a psychiatrist, to advise the firm on plaintiff's ability to return to work.  Plaintiff agreed to meet with Dr. Bernstein and signed waivers allowing review of his medical records by Dr. Bernstein.  Plaintiff also instructed his treating physician to cooperate with Dr. Bernstein.

Dr. Bernstein diagnosed a bipolar disorder and was concerned with relieving the stress and abnormal sleep/wake cycle that contributed to the December 3, 2001 incident. Plaintiff eventually returned to work at C & G, albeit under the limitations set forth in a detailed "return to work" agreement drafted with Dr. Bernstein's input. Pursuant to the terms of the agreement, Plaintiff agreed to limit his work to 30 hours per week, and to only be in the office on weekdays from 8:00 am through 6:00 pm. Iwanejko's return to work was uneventful. He received his same salary, benefits, office, secretary, title and practice area. In October 2002, C & G agreed to expand Plaintiff's work hours to 40 per week.

In March 2003, Allan Tedesco noticed Plaintiff in the office later than 6 pm, in violation of the terms of the "return to work" agreement. C & G, upon investigation, found 87 such violations. When Tedesco confronted Plaintiff, he stated that he had left late only a handful of times. In April 2003, Iwanejko requested, for the first time, a home computer. Iwanejko's employment with C & G was eventually terminated, purportedly for breach of the "return to work" agreement and the misrepresentation to Tedesco regarding the number of prior breaches. Thereafter, he filed this lawsuit.

At this point the only claim against the City of Pittsburgh (the "City") is for alleged civil rights violations under 42 U.S.C. § 1983. The only claims against Officers Aker, Savko and Nicholas in their individual capacities[3] are for alleged civil rights violations under 42 U.S.C. § 1983 (Count I); False Arrest and Imprisonment (Count II); Gross and Willful Negligence (Count III - Officer Aker only); Intentional Infliction of Emotional Distress (Count XIII); and Negligent Infliction of Emotional Distress (Count XIV).[4] The City and the Officers have moved for

---

[3]. The City of Pittsburgh and the Officers in their official capacities are legally indistinguishable. *See Smith v. School Dist. of Philadelphia*, 112 F. Supp. 2d 417, 425 (E.D. Pa. 2000) (*citing Hafer v. Melo*, 502 U.S. 21, 25 (1991)).

[4]. Other defendants had moved for the dismissal of Counts I, II, III, XIII, and XIV under Fed.R.Civ.P. 12(b)(6), but the Officers (individually) did not challenge the sufficiency of the Amended Complaint under Rule 12(b)(6). The Officers now contend that the Amended Complaint does not state claims against them individually. Defendants' Motion at ¶¶ 55-57. The Court rejects this contention, which could have been raised earlier. Additionally, this issue of

7

summary judgment on all remaining claims.

The three remaining claims against C & G are based on (1) negligence per se, for violation of the Pennsylvania Mental Health Procedures Act (MHPA), (2) the Family Medical Leave Act (FMLA) and (3) the Americans With Disabilities Act (ADA) and Pennsylvania Human Relations Act (PHRA).  C & G has moved for summary judgment on all counts.

Standard of Review

Rule 56(c) of the Federal Rules of Civil Procedure reads, in pertinent part, as follows:

[Summary Judgment] shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

An issue of material fact is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The court must view the facts in a light most favorable to the non-moving party, and the burden of establishing that no genuine issue of material fact exists rests with the movant.  *Celotex*, 477 U.S. at 323.  The "existence of disputed issues of material fact should be ascertained by resolving all inferences, doubts and issues of credibility against the moving party."  *Ely v. Hall's Motor Transit Co.*, 590 F.2d 62, 66 (3d Cir. 1978) (*quoting Smith v. Pittsburgh Gage & Supply Co.*, 464 F.2d 870, 874 (3d Cir. 1972)).  Final credibility determinations on material issues cannot be made in the context of a motion for summary judgment, nor can the district court weigh the evidence.  *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632 (3d Cir. 1993).

A court may grant summary judgment if the evidence submitted by the non-movant "is merely colorable or is not significantly probative."  *Anderson*, 477 U.S. at 249-50 (1986).  The non-movant "may not rest upon mere allegations, general denials, or ... vague  statements ."

---

official/individual capacities was discussed by the Court in the Memorandum Opinion on the Rule 12(b)(6) motions.  The Court assumed that the Officers were sued in their official and individual capacities, and the Officers certainly appear to have litigated this case in a manner reflective of that assumption.

*Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir.1991).  When opposing a motion for summary judgment, the party bearing the burden of persuasion must "identify those facts of record which would contradict the facts identified by the movant." *Childers v. Joseph*, 842 F.2d 689, 694-95 (3d Cir. 1988); *see also* Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made and supported ..., an adverse party ... must set forth specific facts showing that there is a genuine issue for trial.  If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.").


Discussion

A.    <u>The City of Pittsburgh</u>

Count I alleges that "[d]efendants SAVKO and NICHOLAS, under the employment, training, supervision and discipline of the Pittsburgh Police Department, used excessive force in physically restraining and transporting IWANEJKO, Jr. for involuntary commitment on December 3, 2001 ..."  Amended Complaint at ¶ 20.  Count I also alleges that "[d]efendant AKER, under the employment, training, supervision and discipline of the Pittsburgh Police Department, filed false report(s) as the basis for the detention and involuntary commitment of Iwanejko, Jr...."  *Id*. at ¶ 21.  The Amended Complaint alleges that these actions "constitute violations of Section 1983 of the Civil Rights Act, 42 U.S.C. § 1983, in that these actions deprived IWANEJKO, Jr. of his constitutional and legal rights by subjecting him to an unreasonable seizure and depriving him of his liberty on the basis of false allegations of his conduct ..."  *Id*. at ¶ 22.

42 U.S.C. § 1983 does not contain any substantive rights, but, instead, it serves as a vehicle to enforce violations of underlying rights committed by state actors.  *See, e.g., Elmore v. Cleary,* 399 F.3d 279, 281 (3d Cir. 2005).  Generally speaking, a successful 1983 claim involves proof of the following three components: (1) state action, (2) causation and (3) a violation of an underlying substantive right.  *See, e.g., id.*  Thus, if there is no violation of a constitutional right, the claim cannot succeed.

Under *Monell v. Department of Social Services*, 436 U.S. 658 (1978) and other Supreme

9

Court precedents, a governmental agency, in this case the City of Pittsburgh, is not liable under § 1983 for the actions of individual employees under a *respondeat superior* theory. Therefore, the City is entitled to summary judgment to the extent that Iwanejko seek to recover from the City for alleged violations committed by the Officers under a *respondeat superior* theory.

Although there is no *respondeat superior* liability under section 1983, "the inadequacy of police training may serve as the basis for § 1983 liability ... where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). As the Third Circuit noted recently, "[t]his typically requires proof of a pattern of underlying constitutional violations." *Carswell v. Borough of Homestead*, 381 F.3d 235, 244 (3d Cir. 2004) (citing *Berg v. County of Allegheny*, 219 F.3d 261, 276 (3d Cir. 2000)). Furthermore, "[a]lthough it is possible, proving deliberate indifference in the absence of such a pattern is a difficult task." *Carswell*, 381 F.3d at 244.

Iwanejko argues that the Officers, as well as then-Chief of Police Robert McNeilly "admitted that no specific involuntary commitment procedure was used (or even existed at the time) and also that routine procedures were not followed in this case, that no specific involuntary commitment procedure was used (or even existed at the time) and that routine procedures concerning eyewitnesses were not followed in this case ...," and therefore the claim survives summary judgment. Pltf's Opposition at 11. This argument takes Chief McNeilly's deposition testimony out of context:

> Q:   I think I understood you to say that you don't have a formal bureau order or procedure specifically covering involuntary commitment?
> A:   No, I never said that. What I did say was how to handle involuntary commitments is a culmination of many policies and that subject matter is covered in so many places. Could be covered in general arrest. Could be covered under use of force. Could be covered under continuum of control. It is covered under use of Tasers. Use of pepper spray. There's so many policies that would be pulled upon. If you're asking me if there's one specific policy generally dealing with 302, how to handle 302, I don't think it's possible to develop one of those, because we had our research department research other departments to see if any such policy existed and we couldn't find any. And it's because you have to take from the various areas. It's already covered in the training. It's already covered in all of the other policies that come together. And what it really comes down to, to have a policy on that, the only difference it would tell you is where to take the person, either they are going to jail or they're going to some mental health facility. So it's senseless to come up with a policy just

to direct you on where to take somebody.

Deposition of Robert McNeilly at 17-18.   Chief McNeilly also testified at length about the considerable training that each City of Pittsburgh Police Officer receives, and he specifically testified that "[e]very officer is given state-mandated training which covers how to handle - recognize and how to handle dealings with mentally disturbed or emotionally distraught people, or, in fact, recognizing physical disabilities that may appear to be mental issues also." *Id.* at 9-10.   The Officers' testimony was basically consistent with that of Chief McNeilly. *See* Officers' Deposition at 29-40.

Iwanejko's claim against the City for failure to train cannot survive summary judgment. There is not sufficient record evidence from which a reasonable factfinder could determine that the City 1) failed to properly train the Officers, 2) had a policy or custom which caused the alleged violations of Iwanejko's civil rights, 3) exhibited deliberate indifference to the rights of persons with whom the police force comes into contact, or 4) had a pattern of underlying constitutional violations.   Therefore, the Court finds and rules that the City is entitled to summary judgment on Iwanejko's claim for failure to train.

B.      Officers James L. Aker, Donald Savko and Joseph Nicholas

Preliminarily, the Court notes that Iwanejko testified that he was not injured when he was handcuffed and placed in the police car, and that he was not otherwise physically abused by the Officers. *See* Iwanejko dep. at 346 ("The officers did not physically abuse me.   They lied about what I did. ...  I was unlawfully committed because of the actions they took.   But no, I was not physically hurt by what they did.").   The Court has found no other evidence which would support Iwanejko's claim for use of excessive force. *See* Amended Complaint at ¶ 20 (alleging that Savko and Nicholas "used excessive force in physically restraining and transporting IWANEJKO, Jr. for involuntary commitment on December 3, 2001.").   Therefore, the Court will grant summary judgment as to Iwanejko's claim for excessive force under section 1983.

Iwanejko has also alleged the following under his section 1983 claim:

Defendant AKER, under the employment, training, supervision and discipline of

the Pittsburgh Police Department, filed false report(s) as the basis for the detention and involuntary commitment of IWANEJKO, Jr. on December 3, 2001. Specifically, the report(s) contain false allegations that IWANEJKO, Jr. "threw a plastic bottle at Kelley, and "attacked her", and "grabbed her by the neck and started kicking her" by "plac[ing] both of his hands around her neck and starting to kick her on her left thigh/ leg" while he was being led from the offices of C&G to the custody of the Pittsburgh Police by TOLHURST.  The report(s) further contain false allegations that IWANEJKO, Jr. "was willing to sign himself into Western Psychiatric", and that he "tried to put his head through the back window at least a dozen times", and that he "attacked" a WPIC employee after being physically restrained and transported by the police to WPIC for his involuntary commitment.

Amended Complaint at ¶¶ 21.  The Amended Complaint alleges that these acts "deprived IWANEJKO, Jr. of his constitutional and legal rights by subjecting him to an unreasonable seizure and depriving him of his liberty on the basis of false allegations of his conduct on December 3, 2001."  Amended Complaint at ¶ 22.

"[T]he first step in evaluating a section 1983 claim is to identify the exact contours of the underlying right said to have been violated and to determine whether the plaintiff has alleged a deprivation of a constitutional right at all."  *Kaucher v. Bucks County*, No. 05-1598, slip op. at 10-11 (3d Cir. Aug. 2, 2006) (citations and quotation marks omitted).  The foregoing allegations do not specifically identify the rights that were allegedly violated.  The Officers have characterized the Amended Complaint as having alleged "violations of the Fourth Amendment and substantive and procedural due process under the Fourteenth Amendment."  Plaintiffs have not challenged this assertion, and the Court assumes it to be correct.

1.    Qualified Immunity - General Principles

The Officers contend that they are entitled to qualified immunity.  Defendants' Motion at 12-13.  In *Wright v. City of Philadelphia*, 409 F.3d 595 (3d Cir. 2005), the United States Court of Appeals for the Third Circuit provided the following discussion of section 1983 claims and the privilege of qualified immunity:

Section 1983 provides a cause of action against any person who, acting under color of state law, deprives another of his or her federal rights.  When an officer's actions give rise to a § 1983 claim, the privilege of qualified immunity, in certain circumstances, can serve as a shield from suit.  The primary purpose of affording public officials the privilege of qualified immunity, thus insulating them from suit, is to protect them from undue interference with their duties and from

> potentially disabling threats of liability.  The privilege of qualified immunity,
> however, can be overcome when state officials violate clearly established statutory
> or constitutional rights of which a reasonable person would have known.

*Wright*, 409 F.3d at 599 (citations and quotations omitted).  The analysis for determining whether

qualified immunity applies was explained by the United States Supreme Court in *Saucier v. Katz*,

533 U.S. 194 (2001):

> A court required to rule upon the qualified immunity issue must consider, then,
> this threshold question: Taken in the light most favorable to the party asserting the
> injury, do the facts alleged show the officer's conduct violated a constitutional
> right?  This must be the initial inquiry. ...  If no constitutional right would have
> been violated were the allegations established, there is no necessity for further
> inquiries concerning qualified immunity.  On the other hand, if a violation could
> be made out on a favorable view of the parties' submissions, the next, sequential
> step is to ask whether the right was clearly established.

*Saucier*, 533 U.S. at 201.  Over a well-reasoned dissent by Judge Smith, in *Wright* the Third

Circuit interpreted *Saucier* and the Supreme Court's subsequent opinion in *Brosseau v. Haugen*,

543 U.S. 194 (2004) to establish "a two-step qualified immunity inquiry, with the first step being

the 'constitutional issue' and the second step being 'whether the right was clearly established.'"

*Wright*, 409 F.3d at 601.  The Third Circuit has recently summarized the inquiry into whether a

right was "clearly established:"

> As a general matter, a right is clearly established for purposes of qualified
> immunity when its contours are sufficiently clear that a reasonable official would
> understand that what he is doing violates that right.  To find that a right is clearly
> established, the right allegedly violated must be defined at the appropriate level of
> specificity.  As the Supreme Court explained in *Hope v. Pelzer*, in some cases "a
> general constitutional rule already identified in the decisional law may apply with
> obvious clarity to the specific conduct in question, even though the very action in
> question has [not] previously been held unlawful." 536 U.S. 730, 741. Indeed,
> officials can still be on notice that their conduct violates established law even in
> novel factual circumstances.

*Williams v. Bitner*, No. 05-1930, slip op. at 9 (3d Cir. July 25, 2006) (citations and quotation

marks omitted).[5]  Finally, in the Third Circuit "qualified immunity is an objective question to be

decided by the Court as a matter of law."  *Carswell*, 381 F.3d at 242 (*citing Doe v. Groody*, 361

F.3d 232, 238 (3d Cir. 2004)).  The Court will address the constitutional claims *seriatim*.

---

[5].  2006 WL 2052179.

a.     The Allegedly Unreasonable Seizure

In *Doby v. DeCrescenzo*, 171 F.3d 858 (3d Cir. 1999), the Third Circuit addressed the Fourth Amendment implications of involuntary commitment proceedings under the Pennsylvania Mental Health Procedures Act ("MHPA").   Preliminarily, the *Doby* court observed that "[t]he Fourth Amendment applies to seizures in civil, as well as criminal, proceedings," and that "[t]he fundamental inquiry in such proceedings, however, remains whether the government's conduct is reasonable under the circumstances." *Doby*, 171 F.3d at 871 (citations omitted).   Relying upon and endorsing the First Circuit's holding in *McCabe v. Life-Line Ambulance Service, Inc.*, 77 F.3d 540, 549 (1st Cir. 1996), the Third Circuit held that "the temporary involuntary commitment of those deemed dangerous to themselves or others qualifies as a 'special need' permitting the state to act without a warrant." *Doby*, 171 F.3d at 871 (citation omitted).   Thus, the Officer need not have probable cause, nor must they obtain a warrant, prior to initiating involuntary commitment proceedings.

Viewing the facts in the light most favorable to Plaintiff, the Court finds that his involuntary commitment was proper under the "special needs" doctrine.   It is undisputed that Iwanejko was severely mentally disabled at the relevant time, and that his disability was readily apparent to everyone he encountered.   Moreover, although there are disputes of fact regarding the extent of his violent behavior, the Officers were informed of sufficient evidence of same to conclude that he was either a danger to himself, or others, or both.   Therefore, the Court finds that Plaintiff cannot establish a violation of his Fourth Amendment rights.

Assuming that Iwanejko was able to establish a violation of his Fourth Amendment rights, the Court finds that the Officers are nevertheless entitled to summary judgment.   At the second step of the qualified immunity analysis, there is no doubt that the right to be free from unreasonable seizures, and the right to be involuntarily committed only upon a showing of dangerousness, are clearly established rights. *See Saucier*, 533 U.S. at 201; *Doby*, 171 F.3d at 871.   However, "[o]nce these requirements are found to have been satisfied, the inquiry proceeds to another, closely related issue, that is, whether the officer made a reasonable mistake as to what the law requires." *Carswell*, 381 F.3d at 242.   Our court of appeals has also reiterated that "[t]he

14

concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct ... [i]f the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense." *Id.* (*quoting Saucier*, 533 U.S. at 205).[6]  The Court finds and rules that any mistake which may have been made by the Officers regarding Plaintiff's Fourth Amendment rights was reasonable.  Viewing the facts in the light most favorable to Plaintiff, as the Court is obligated to do at this juncture, it nevertheless appears that the Officers witnessed and/or were informed of sufficient facts to justify Plaintiff's involuntary commitment under the circumstances.  Accordingly, the Court will grant summary judgment as to Iwanejko's Fourth Amendment claim.

b.    Procedural Due Process

In *Doby, supra*, our court of appeals rejected a procedural due process challenge to involuntary commitment proceedings under the MHPA.  The plaintiffs contended that "permitting individuals other than mental health professionals to petition for a section 7302 warrant violates the Due Process Clause of the Fourteenth Amendment."  *Doby*, 171 F.3d at 869.  The Third Circuit observed that "due process is a flexible notion and that what kind of process is due depends on the individual and state interests at stake," and that the procedures for involuntary commitment set forth in the MPHA were "created to allow the counties to handle *emergency* situations."  *Id*. at 870 (italics in original).  Based upon the foregoing principles (and others), the *Doby* court held that the procedures for an involuntary commitment pursuant to a Warrant for Emergency Examination under 50 P.S. § 7302(a)(1) satisfied the procedural due process requirements of the Fourteenth Amendment.  Iwanejko, however, was involuntarily committed pursuant to 50 P.S. § 7302(a)(2), which provides for "Emergency Examination Without a Warrant."  This provision provides as follows:

> Upon personal observation of the conduct of a person constituting reasonable
> grounds to believe that he is severely mentally disabled and in need of immediate

---

[6].  The objective reasonableness of an officer's actions is a question of law to be decided by the Court.  *Sharrar v. Felsing*, 128 F.3d 810, 828 (3d Cir. 1997).

> treatment, and physician or peace officer, or anyone authorized by the county administrator may take such person to an approved facility for an emergency examination. Upon arrival, he shall make a written statement setting forth the grounds for believing the person to be in need of such examination.

50 P.S. § 7302(a)(2).

Although the *Doby* court did not determine whether the procedural protections provided by the above provision satisfy procedural due process, based upon the *Doby* court's rationale, the Court finds and rules that they do.  As the *Doby* court pointed out, "what kind of process is due depends on the individual and state interests at stake," the MHPA's procedures were "created to allow the counties to handle *emergency* situations," and "the application procedure itself has a built-in safeguard to prevent ill-motivated individuals from seeking the involuntary examination of others: the face of the application includes a clear statement providing that anyone who supplies false information to the county may be prosecuted criminally."  *Doby*, 171 F.3d at 870. The Court also notes that the time limitations applicable to involuntary commitments under the MHPA weigh against a finding that the procedures violate procedural due process.  *See id.*

Assuming that Iwanejko was able to establish a violation of his procedural due process rights, the Court finds that the Officers are nevertheless entitled to summary judgment.  The *Doby* decision, as well as other precedents in the area of involuntary commitments, reflect that a citizen's right to procedural due process is "clearly established."  However, "[o]nce these requirements are found to have been satisfied, the inquiry proceeds to another, closely related issue, that is, whether the officer made a reasonable mistake as to what the law requires." *Carswell*, 381 F.3d at 242.  Our court of appeals has also reiterated that "[t]he concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct ... [i]f the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense." *Id.* (*quoting Saucier*, 533 U.S. at 205).  The Court finds and rules that any mistake made by the Officers regarding Plaintiff's procedural due process rights was reasonable.  Accordingly, the Court will grant summary judgment as to Iwanejko's claim for a violation of his procedural due process rights.

c. <u>Substantive Due Process</u>

The Officers also address a claim for substantive due process, which is not explicitly pled in the Amended Complaint.  Nevertheless, the Court will address same on the merits.  "A substantive due process violation is established if the government's actions were not rationally related to a legitimate government interest or were in fact motivated by bias, bad faith or improper motive."  *Doby*, 171 F.3d at 871 n.4 (*quoting Sameric Corp. of Delaware, Inc. v. City of Philadelphia*, 142 F.3d 582, 590 (3d Cir.1998)).  The Court finds that summary judgment is proper.  There is not sufficient evidence of record to support a finding that the Officers' actions were "not rationally related to a legitimate government interest or were in fact motivated by bias, bad faith or improper motive."  *Id.*  Accordingly, summary judgment on this claim will be entered.

2. <u>The Tort Claims Under Pennsylvania Common Law</u>

As mentioned above, the Amended Complaint states claims against the Officers for False Arrest and Imprisonment, Gross and Willful Negligence (Aker only), Intentional Infliction of Emotional Distress, and Negligent Infliction of Emotional Distress.  The Officers contends that they are entitled to immunity under the Political Subdivision Tort Claims Act (the "Act"), 42 Pa.C.S. § 8541 *et seq.*  Generally speaking, local agencies and municipalities are granted immunity from state law tort claims under the Act.  Section 8541 of the Act provides as follows:

> Except as otherwise provided in this subchapter, no local agency shall be liable for any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof or any other person.

42 Pa.C.S. § 8541.  However, section 8542, which modifies the general grant of governmental immunity in limited circumstances, provides as follows:

> A local agency shall be liable for damages on account of an injury to a person or property within the limits set forth in this subchapter **if** both of the following conditions are satisfied **and** the injury occurs as a result of one of the acts set forth in subsection (b):
>
> (1) The damages would be recoverable under common law or a statute creating a cause of action if the injury were caused by a person not having available a defense under section 8541 (relating to governmental immunity generally) or section 8546 (relating to defense of official immunity); and

17

> (2) The injury was caused by the negligent acts of the local agency or an employee thereof acting within the scope of his office or duties with respect to one of the categories listed in subsection (b). As used in this paragraph, "negligent acts" shall not include acts or conduct which constitutes a crime, actual fraud, actual malice or willful misconduct.

42 Pa.C.S.A. § 8542.  The exceptions to immunity set forth in subsection (b) of section 8542 are the operation of motor vehicles, care of personal property, care of real property, dangerous conditions from trees, traffic controls and street lighting, utility service facilities conditions, street conditions, sidewalk conditions, and the care, custody or control of animals.  42 Pa.C.S.A. § 8542(b).

Under 42 Pa.C.S. § 8545, an employee of a municipality acting within the scope of his office or duties has the same immunity as his employer.[7]  The employee's immunity is lost only if "it is judicially determined that the act of the employee caused the injury and that such act constituted a crime, actual fraud, actual malice, or willful misconduct."  42 Pa.C.S. § 8550.

The Court finds and rules that the Officers are entitled to immunity under the Act.  The Court has thoroughly reviewed the evidence of record and finds that there is not sufficient evidence to establish that any of the Officers' actions "constituted a crime, actual fraud, actual malice, or willful misconduct."  42 Pa.C.S. § 8550.  As for crime and/or fraud, there is simply no evidence that the Officers engaged in any criminal or fraudulent activity on December 3, 2001.  As for "actual malice," the Court cannot find any evidence from which a reasonable fact finder could conclude that the Officers acted with malice toward Iwanejko.  The same can be said of "willful misconduct."  The Court recognizes that there are disputes of fact regarding exactly what occurred in December 3, 2001.  However, viewing the evidence in the light most favorable to Plaintiff, the Court cannot cite to sufficient record evidence upon which a reasonable factfinder

---

[7]. Section 8545 provides as follows:
An employee of a local agency is liable for civil damages on account of any injury to a person or property caused by acts of the employee which are within the scope of his office or duties *only to the same extent as his employing local agency and subject to the limitations imposed by this subchapter.*
42 Pa.C.S. § 8545 (italics added).

could conclude that the Officers are not entitled to immunity under the Act.  Therefore, the Court will grant summary judgment in favor of the Officers on Plaintiffs' claims for False Arrest and Imprisonment, Gross and Willful Negligence, Intentional Infliction of Emotional Distress, and Negligent Infliction of Emotional Distress.[8]

C.    Cohen & Grigsby

       The Court concludes that C & G is entitled to summary judgment on all counts.  There is simply no way that a reasonable fact-finder could find for Plaintiff, even giving him every plausible inference.  As set forth above, the incident on December 3, 2001 involved very serious and potentially dangerous conduct.  C & G, as an employer facing potential *respondeat superior* liability for Plaintiff's conduct, had legitimate concerns about the safety and well-being of its staff, visitors, other tenants, and Plaintiff himself.  It appears that C & G acted properly, and even graciously, in its efforts to continue Iwanejko's employment.

       1.    Negligence Per Se Claim Based on MHPA

       Summary judgment is clearly appropriate on the negligence per se claim.  Negligence per se is defined as conduct that may be treated as negligence without any proof of the particular underlying circumstances.  *Mahan v. Am-Gard, Inc.*, 841 A.2d 1052, 1059 (Pa. Super. 2003).  A violation of a statute or ordinance may serve as the basis for negligence per se.  *Id.*  The doctrine establishes the elements of duty and breach of duty, although a plaintiff must still prove causation.  *Id.*  To establish a negligence per se claim, plaintiff must establish the following elements: (1) the purpose of the statute must be to protect a certain group of individuals, as opposed to the public generally; (2) the statute must clearly apply to defendant's conduct; (3) the

---

[8]. Iwanejko's parents were reinstated as plaintiffs pursuant to the Court's Order dated October 5, 2005.  The parents' only remaining claims are set forth in Count XIV for negligent infliction of emotional distress against Officers Aker, Savko and Nicholas.  The Court has found that Count XIV failed to state a claim, but those Officers had not filed a motion to dismiss.  For the reasons discussed above, and because the claims are legally insufficient, the Court finds that the Officers are entitled to summary judgment on these claims.

defendant must have violated the statute; and (4) the violation must be the proximate cause of plaintiff's injury. *Id.*

Plaintiff argues that physicians from Western Psychiatric impermissibly discussed confidential information with Dr. Bernstein, as an agent of C & G, in violation of the MHPA. Plaintiff has failed to adduce any evidence in the record that supports this theory. C & G, by contrast, cites: (1) testimony from Dr. Bernstein that informed consent was obtained during each of his visits with plaintiff (Bernstein Deposition at 121-122); (2) waivers executed by plaintiff which authorized Dr. Carter and Dr. Mitzel to disclose medical records to Dr. Bernstein (Exhibits G, N); and (3) testimony from Dr. Carter noting that plaintiff asked him to cooperate with Dr. Bernstein (Carter Deposition at 61). Thus, it is beyond dispute that any discussion of Plaintiff's medical condition was consensual, and therefore, the MHPA was not violated.

The elements of a negligence per se claim cannot be met on another ground, as well. One undisputed element of the cause of action is that the statute must **clearly apply** to the conduct of the defendant. Plaintiff's Opposition at 17 (citing *Wagner v. Anzon, Inc.*, 684 A.2d 570 (Pa. Super. 1996)) (emphasis added). As C&G points out, the MHPA has never been applied to a non-medical entity such as a law firm, and thus, it cannot "clearly apply" to C & G's conduct. *O'Donnell v. United States*, 891 F.2d 1079, 1085 (3d Cir. 1989).


2.      Family Medical Leave Act

Summary judgment is also appropriate on the FMLA claim. The gravamen of Plaintiff's complaint is that he wanted to be taken off FMLA leave and restored fully to work without any conditions or restrictions. To succeed on a claim under the FMLA for failure to reinstate to an equivalent position, a plaintiff must establish: (1) that he was not returned to an equivalent position when he returned from leave; and (2) that he could perform the essential functions of the position. *Rinehimer v. Cemcolift, Inc.*, 292 F.3d 375, 384 (3d Cir. 2002).

The record demonstrates that C & G engaged in extensive efforts specifically designed to accommodate Plaintiff and restore him to work. Immediately after the incident, Plaintiff **did** receive FMLA leave. Then, Iwanejko was reinstated to not just a substantially equivalent

position, as required under the statute, but to a virtually identical position.  He was returned to the same office, secretary, salary, benefits and work group.  The only difference was the limitation on his hours to no more than 30 hours per week[9] between 8:00 a.m. and 6:00 p.m. on weekdays, which did not make the position more onerous.[10]  There can be no reasonable dispute of fact as to whether the position was "substantially equivalent."  The case relied on by Plaintiff, *Hunt v. Rapides Healthcare System, LLC*, 277 F.3d 757 (5th Cir. 2001), is distinguishable because the factual question in that case was whether a night shift for a nurse was substantially similar to a day shift.  Here, there is no reasonable dispute that Iwanejko was reinstated to his same position.

Plaintiff contends that it was discriminatory and/or retaliatory to impose any type of hours restriction.  The Court cannot agree.  As an initial matter, Plaintiff misstates the factual record regarding the need for restricted hours.  He initially contends that Dr. Carter signed an order on January 24, 2002 which stated that Plaintiff could return to work without restrictions.  This is not completely accurate.  The FMLA Certification of Health Care Provider does state that employee will not need to work a reduced schedule, but also recommends a "resumption of duties in 1-2 weeks as tolerated" and "gradual resumption of workload and lower stress environment."  Also, Dr. Carter testified that he still considered Plaintiff to be at risk of another episode and that he needed a normal sleep/wake pattern and lower stress.  Carter Deposition at 70-71, 78.  Moreover, Dr. Carter explained that it was not his role to determine work restrictions, but rather that was Dr. Bernstein's role.  Id. at 88-89.  Plaintiff next contends that Dr. Bernstein did not recommend a "specific" number of hours.  While it is true that there was no "specific" recommendation, Dr. Bernstein certainly did opine that Plaintiff's hours be reduced and his sleep/wake cycle be controlled to prevent another incident and Dr. Bernstein did participate with C & G in setting the applicable restrictions.  Bernstein Deposition at 45-47.  More fundamentally, it appears that

---

[9]In October 2002, Iwanejko was permitted to work forty hours per week.

[10]This case is distinguishable from situations involving hourly employees, in which a limitation on hours translates directly into a loss of income.

Plaintiff does not appreciate the seriousness of the December incident and discounts the validity of C & G's concerns about the safety of co-workers, visitors and tenants, as well as Plaintiff's own safety. It was appropriate for C & G, acting on the advise of Dr. Bernstein, to impose reasonable limits on Iwanejko's work hours which appear to have been rationally designed to prevent the type of stress that triggered the subject behavior exhibited on December 3, 2001.

To the extent that Plaintiff asserts a retaliation claim under the FMLA, it must also fail. The elements of a prima facie case for retaliation under the FMLA are: (1) that plaintiff availed himself of a protected right under the FMLA; (2) that he suffered an adverse employment action; and (3) that there was a causal connection between the protected activity and the employer's adverse action. *Conoshenti v. Public Serv. Elec. & Gas Co.,* 364 F.3d 135, 146 (3d Cir. 2004). The McDonnell-Douglas burden shifting approach applies. If the employer asserts a legitimate, non-discriminatory reason for the action, the burden shifts back to plaintiff to show that the reason was pretextual. Defendant argues that there was no causal connection between the leave and the adverse employment action. Defendant points out that Iwanejko was not terminated until after he breached the "return to work" agreement and affirmatively misled C & G regarding the extent of those breaches when confronted. Plaintiff contends that the events are connected, in that if the restriction on work hours had not been imposed through the "return to work" agreement, he would not have violated the agreement.

The Court agrees with Defendant. Plaintiff has not produced any evidence of a discriminatory motive in C & G's action to terminate him. There was a significant intervening event – specifically, Plaintiff's breach of the "return to work" agreement. There is no evidence in the record that either the December incident, the fact that Iwanejko had been on leave, the "return to work" agreement itself, or the hours limitation contained therein, had anything to do with Plaintiff's termination. To the contrary, the record reflects that C & G had no complaints with Iwanejko's return to work and performance under the terms of the agreement. Tedesco Deposition 66-72. Plaintiff has not cited any evidence of criticism for failing to get all his work done and no evidence that he ever requested permission to violate the "return to work" agreement in order to complete any specific project. It was not until after the discovery of Plaintiff's

22

repeated breaches of the agreement, and his failure to truthfully acknowledge the extent of those breaches, that the adverse employment action was taken.[11]  On the evidentiary record before the court, no reasonable factfinder could conclude that C & G's reason for the termination of Plaintiff's employment was pretextual or causally connected to Plaintiff's assertion of rights under the FMLA.  *See Salley v. Circuit City Stores, Inc.*, 160 F.3d 977, 981 (3d Cir. 1998).

　　　　3.　　　　Americans With Disabilities Act/PHRA

　　　　Plaintiff contends that his ADA/PHRA claim survives summary judgment for two reasons.  First, Iwanejko contends that C & G discriminated and/or retaliated against him in terminating him for alleged violations of the "return to work" agreement and he further contends that C & G's cited reason was pretextual.  The reasons that this Court expressed in rejecting Plaintiff's retaliation claim under the FMLA are equally valid here.  C & G continued Iwanejko's employment for several months, with good results, pursuant to the "return to work" agreement and only took adverse employment action after Plaintiff's multiple breaches of that agreement were discovered.  Plaintiff has not demonstrated that C & G's legitimate, non-discriminatory reason for the termination (i.e., the repeated breaches of the agreement and failure to fully disclose them) was pretextual or was causally connected to Plaintiff's disability.[12]

　　　　Next, Plaintiff contends that C & G failed to participate in an interactive process to

---

[11]At the time of termination, C & G also had in its possession an opinion from Dr. Bernstein that Plaintiff evinced "substantial denial regarding the severity of his return-to-work agreement transgressions, the severity of his psychiatric disease, and the factual events that occurred on the date of his acute decompensation" that "bodes poorly for his prognosis and future treatment compliance."  Dr. Bernstein further explained that but for the violations, he would have recommended an expanded work week, but "this episode causes me great concern since denial of a chronic illness, and associated maladaptive behaviors, is associated with substantial risk for relapse of same."  Dr. Bernstein letter dated May 5, 2003.

[12]The record does not support the factual premise of Plaintiff's assertion that C & G's reason must have been pretextual because there was "unanimous advice from the physicians involved" that hours restrictions were not necessary at the time of his termination.  Plaintiff's Opposition at 14.  To the contrary, C & G's consultant expressed grave doubts about Plaintiff's prognosis.  *See* Dr. Bernstein's letter *supra* n.10.

accommodate his disability.  There is no evidentiary support for this contention in the record.  As an initial matter, the work hours restriction *was* an accommodation.  Due to the gravity of the December 2001 behavioral incident, C & G would likely have been justified in summarily terminating Plaintiff's employment.  Instead, to C & G's credit, the firm decided to help Iwanejko return to work.  The limited hours and the curfew were established, upon medical advice, to prevent the stress and poor sleep patterns that had led to the December incident.  What Plaintiff sought was an end to the accommodation because, in his view, he no longer had a disability.  The record also reflects that an interactive process did take place.  Dr. Bernstein continued to review medical records and meet periodically with Plaintiff, and in October 2002, Iwanejko's hours were increased from 30 to 40 hours/week.  Any breakdown in the interactive process was Plaintiff's doing.  Home computer access was not requested until after his breach of the agreement was discovered.  Plaintiff never complained about being unable to get his work done.  Tedesco Deposition at 76. In summary, no reasonable fact-finder could conclude that there was a violation of the ADA or PHRA based on this evidentiary record.

Conclusion

For the reasons hereinabove stated, the Court will grant the Defendants' Joint Motion for Summary Judgment and the Motion for Summary Judgment filed by Cohen & Grigsby.  An appropriate Order follows.

McVerry, J.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **GERALD J. IWANEJKO, JR., GERALD J. IWANEJKO, SR., and PATRICIA IWANEJKO,** ) ) ) ) | |
| **Plaintiffs,** ) ) | |
| **v.** ) ) | **2:03-cv-1855** |
| **COHEN & GRIGSBY, P.C., THE CITY OF PITTSBURGH, PA., PITTSBURGH POLICE OFFICERS JAMES L. AKER, DONALD SAVKO AND JOSEPH NICHOLAS,** ) ) ) ) ) ) | |
| **Defendants.** ) | |

## ORDER OF COURT

AND NOW, this 15th day of September, 2006, in accordance with the foregoing Memorandum Opinion it is hereby **ORDERED, ADJUDGED and DECREED** Defendants' Joint Motion for Summary Judgment (*Document No. 122*) is **GRANTED** and Cohen & Grigsby's Motion for Summary Judgment (*Document No. 117*) is **GRANTED**. The clerk shall docket this case closed.

BY THE COURT:

s/ Terrence F. McVerry
United States District Court Judge

cc:  Gerald Joseph Iwanejko, Jr., Esquire
Email: giwanejko@earthlink.net

Edward A. Yurcon, Esquire
Email: edyurcon@ambylaw.com

Jamie L. Hudson, Esquire
Email: jhudson@ambylaw.com

Bryan Campbell, Esquire
Email: bryancmpbl@yahoo.com

Michael E. Kennedy, Esquire
Email: michael.kennedy@city.pittsburgh.pa.us

Susan E. Malie, Esquire
Email: susan.malie@city.pittsburgh.pa.us